IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT E. JONES,

    Plaintiff,                     No. CIV S-05-2323 WBS GGH

    vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,
                                       FINDINGS AND RECOMMENDATIONS

    Defendant.
                              /

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). On January 31, 2007, this court vacated the summary judgment motions and ordered further briefing on the issue of plaintiff's drug use, and whether drug addiction is a contributing factor material to disability under 42 U.S.C. § 423(d)(2)(C). Now that the parties have filed their briefing, the court reinstates the summary judgment motions and will address the issues raised by the parties with the further briefing in mind.

        For the reasons that follow, the court recommends that plaintiff's Motion for Summary Judgment or Remand be granted in part, the Commissioner's Cross Motion for Summary Judgment be denied, and the Clerk be directed to enter judgment for the plaintiff.

1

This case should be remanded for further findings pursuant to sentence four of 42 U.S.C. §405(g).

BACKGROUND

Plaintiff, born January 20, 1951, applied for disability benefits on July 24, 2002, with a protective filing date of July 18, 2002. (Tr. at 51-52.) Plaintiff alleged he was unable to work since July 1, 1999,[1] due to depression, difficulty dealing with people, arthritis of the knee, cervical disc disease, periodontal disease, and multiple hernias. (Tr. at 17-18, 52, 59.) In a decision dated November 10, 2004, ALJ Mark C. Ramsey determined that plaintiff was not disabled.[2] The ALJ made the following findings:

---

[1] Plaintiff elsewhere stated he has been unable to work since December, 2000 and December, 2001. (Tr. at 59, 72.)

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

2

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 30, 2003.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's bipolar II, depressed, borderline intellectual functioning, degenerative changes at C5-6 and C6-7, mild left shoulder impingement syndrome, and right knee effusion are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: lift 25 pounds occasionally and 20 pounds frequently, walk/stand six hours, sit six hours, occasionally perform postural activities but avoid crouching and stooping, occasionally reach overhead on the left, and mentally perform simple job instructions (unskilled work) with limited interpersonal contact.

7. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8. The claimant is an "individual closely approaching advanced age" (20 CFR § 404.1563).

9. The claimant has "a limited education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform substantially all of the full range of light work (20 CFR § 404.1567).

12. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Medical-Vocational Rule 202.11, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not

|   |   |   |
|---|---|---|
| 1 |   | disabled." |
| 2 | 13. | The claimant's capacity for light work is substantially intact and has not been compromised by any nonexertional limitations. Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled. |
| 5 | 14. | The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)). |

(Tr. at 28-29.)

ISSUES PRESENTED

Plaintiff has raised the following issues: (A) Whether the ALJ Failed to Give Adequate Weight to the Opinion of Plaintiff's Treating Psychiatrist, and Failed to Adequately Evaluate the Inconsistencies in Consulting Psychologist Richwerger's Evaluations; (B) Whether the ALJ Failed to Adequately Evaluate Plaintiff's Credibility; and (C) Whether a Vocational Expert Should Have Been Consulted Given the Multiple Limitations on Claimant's Residual Functional Capacity.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

    A.  Treating Psychiatrist

Plaintiff claims that the ALJ erred in relying on the inconsistent reports of psychologist Dr. Richwerger, and improperly rejected the opinion of treating physician Dr. Andrews without specific and legitimate reasons.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[3] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

---

[3] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

5

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

In this case, Dr. Andrews, plaintiff's treating physician, diagnosed major depression and generalized anxiety disorder on June 20, 2002.  GAF was 50 at this time.[5]  (Tr. at 262.)  Later, on December 31, 2002, he diagnosed bipolar II, generalized anxiety disorder, and posttraumatic stress disorder.  Prognosis was guarded.  (Tr. at 246.)  Plaintiff was taking Wellbutrin in October, 2002, with some benefit, including increased energy and motivation, but experienced some tinnitus. (Tr. at 251.)

More recently, on March 30, 2004, Dr. Andrews performed a mental assessment. He determined that plaintiff was markedly limited in:  ability to remember locations and work-like procedures, to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to stick to a schedule, maintain regular attendance, and be punctual, to sustain a routine without special supervision, to complete a normal workday and week without interruptions, to perform at a consistent pace without unreasonable rest periods, to interact appropriately with the public, to accept instructions

---

[4] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

[5] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, a GAF of 41-50 indicates: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

1 and respond to criticism from supervisors, to get along with coworkers and peers without
2 distracting them, to maintain appropriate behavior and appearance, to adapt to changes in the
3 work setting, to travel in unfamiliar places or use public transportation, and to set realistic goals
4 and make plans independently. (Id. at 302-04.) Plaintiff was found to be moderately limited in
5 the following areas: understanding remembering, and carrying out short and simple instructions,
6 working in coordination with others without distraction, making simple work related decisions,
7 asking simple questions, and being aware of normal hazards and taking precautions against them.
8 (Id.) Dr. Andrews explained these findings, stating that plaintiff suffered from mood swings,
9 depression, suicidal ideations, aggressive outbursts, and anxiety. (Id. at 304.)

10          The ALJ found that Dr. Andrews' treatment notes leading up to this assessment
11 did not support it. For example, on September 17, 2003, plaintiff was doing much better. (Id. at
12 327.) On October 15, 2003, plaintiff's depression, anxiety, and agitation had decreased. Xanax
13 had helped with anxiety. (Id. at 325.) On November 17, 2003, plaintiff reported that he had
14 more energy, and was feeling better, despite his wife's comment that he gets agitated and quite
15 angry at times. Dr. Andrews opined that this was a turnaround because plaintiff usually had not
16 done this well. (Id. at 322.) In comparison to plaintiff's earlier visits, he had improved. For
17 example, on June 26, 2003, plaintiff stated that it did not take much to set him off, and was
18 experiencing such agitation that he was unable to control what he said. (Id. at 331.) About six
19 months later, on December 22, 2003, plaintiff's depression and anxiety had decreased. (Id. at
20 321.) On December 30, 2003, Dr. Andrews noted that plaintiff was "doing fairly well at this
21 time." Energy had improved with Provigil. (Id. at 319.) On January 6, 2004, depression,
22 anxiety and agitation had decreased. Xanax was helping the anxiety level. (Id. at 318.) On
23 February 12, 2004, plaintiff was not having any abnormal or psychotic thoughts, and depression
24 and anxiety had decreased. Plaintiff was having some low energy at this time. (Tr. at 316.) On
25 March 17, 2004, plaintiff's recent and remote memory were good, attention and concentration
26 were fair, and depression and anxiety had decreased. (Id. at 307.) At this time, thoughts were

7

logical, description of associations was intact, and plaintiff was not having suicidal ideations. (Id.) On March 25, 2004, Dr. Andrews reported the plaintiff felt better with Wellbutrin. (Id. at 306.)

A comparison of Dr. Andrews' notes between April 8, 2003 and March 25, 2004 shows a steady improvement in plaintiff's mental state over time, with adjustment of medication. (Tr. at 301-39.) The optimism and improvement in the notes is not reflected in the March, 2004 assessment.

The ALJ summarized Dr. Andrews' aforementioned chart notes and found that they were inconsistent with his functional assessment, which in turn was inconsistent with the assessments by the state agency examiners, Dr. Richwerger's two assessments, and with plaintiff's daily activities and testimony. (Tr. at 20.) As a result, the ALJ rejected Dr. Andrews' functional assessment.

These reasons to reject Dr. Andrews are specific and legitimate. A review of the record relied upon by the ALJ indicates that the mental residual functional capacity assessment done on November 22, 2002, *before* plaintiff started showing improvement, indicated for the most part that plaintiff was not significantly limited. (Tr. at 233-34.) The only areas of moderate limitation were in the ability to carry out detailed instructions, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Id.) The explanation for this assessment was "borderline intellectual functioning will reduce ability to manage detail and adapt to change. Depression factor may reduce public interaction. He can adapt to competitive employment." (Tr. at 235.)

A psychiatric review technique form by the SSA, dated April 15, 2003, assessed plaintiff with borderline intellectual functioning and depressive syndrome. (Id. at 266, 267.) Plaintiff was found to be mildly limited in activities of daily living and in maintaining concentration, persistence, or pace, and moderately limited in maintaining social functioning. (Id. at 273.) Notes of this assessment state that medication has decreased plaintiff's depression,

8

anxiety, agitation, and lability. (Id. at 275.) This doctor also noted that plaintiff gave a "sub-optimal effort" on the consultative exam, resulting in borderline I.Q. and lower WAIS scores. (Id.) There were also notations that plaintiff smoked marijuana daily and had decreased concentration. (Id.) Although plaintiff claimed his depression was worse, Dr. Mateus noted that there was no "MEOR" that would show this. (Id. at 280.) There was also no evidence of a severe mood disorder problem. (Id.)

Dr. Richwerger evaluated plaintiff in 2002 and 2004. The earlier report, dated September 16, 2002, makes findings after a series of tests and review of medical records. This psychologist opined that administration of the tests indicated suboptimal level of effort and indicates possible performance inconsistencies throughout the evaluation. (Tr. at 220.) In any event, the results were borderline range for cognitive impairment. Full scale I.Q was 63. Dr. Richwerger noted that plaintiff tended to give up quickly on certain subtests, concluding that the score was an underestimate of plaintiff's actual cognitive ability based on performance inconsistencies. (Id.) He estimated that plaintiff's actual ability was borderline rather than mildly impaired. Plaintiff was diagnosed with depressive disorder, moderate, cannabis dependence (active), polysubstance dependence in remission, borderline intellectual functioning, and a GAF of 60.[6] (Id. at 221.) This psychologist concluded the prognosis was unclear due to performance inconsistencies and daily use of marijuana which may be affecting his depressive disorder and his attention and concentration.[7] (Id. at 222.) He did think that plaintiff would be unable to do detailed and complex tasks, but could do simple and repetitive tasks. Plaintiff could maintain concentration, persistence and pace, maintain adequate social functioning, and adapt to usual stresses in the workplace. (Id.)

---

[6] According to the DSM IV, a GAF of 51 to 60 indicates moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or moderate difficulty in functioning as in few friends or conflicts with peers or co-workers.

[7] Dr. Andrews' report corroborates this use of two bowls daily in 2002, as reported by plaintiff. (Id. at 261.)

1        Dr. Richwerger's June 29, 2004 evaluation of plaintiff indicates that plaintiff had
bipolar II, depressed, cannabis abuse, episodic, borderline intellectual functioning with an I.Q.
score of about 75, and GAF of 58.  (Id. at 357, 358.)  Although this report does not discuss the
effect of cannabis use on plaintiff's functional ability, at this time plaintiff reported he was using
this drug only occasionally.[8]  (Id. at 355.)  Plaintiff reported that when he worked in the past, he
got along okay with coworkers.  (Id. at 355.)  He also gets along with his wife and son, but does
not interact with friends and neighbors.  (Id.)  At the end of the testing, plaintiff became very
angry that the test was too easy.  He said, "I worked fourteen years.  I paid money.  How come
they don't believe me?"  He then walked out.  (Id. at 356.)  Dr. Richwerger thought plaintiff was
not impaired in understanding, remembering, and carrying out short, simple instructions, and
making judgments on simple work related decisions.  (Id. at 359.)  He did think plaintiff was
moderately impaired in understanding, remembering, and carrying out detailed instructions.  (Id.)
Plaintiff was also found to be moderately restricted in interacting appropriately with the public,
supervisors, and coworkers, and moderately affected in responding appropriately to changes in a
routine work setting.  (Id. at 360.)  He was markedly impaired in responding appropriately to
work pressures in a usual work setting.  (Id.)

     The ALJ also relied on plaintiff's reported daily activities, which included
"laundry, vacuuming, visiting family, working in the vegetable garden shoveling dirt and putting
in fertilizer, and changing the oil in the truck when needed...."  (Id. at 22.)

     These medical opinions conflict with Dr. Andrews' functional assessment.  The
ALJ properly rejected this assessment based on specific and legitimate references to these other
opinions.

---

[8] At his April, 2004 hearing, plaintiff reported that he had smoked marijuana only a couple of times in the last few months, and that his habit of smoking two bowls a day occurred two or three years ago.  (Id. at 380.)  Later in the hearing, plaintiff testified that he smokes marijuana to help him sleep, but only once or twice a week.  (Id. at 397, 380.)  His wife testified that he does not smoke as much as he used to, that she does not think he still smokes it, but she could not say how often or how much he smoked.  (Id. at 403-04.)

Plaintiff next claims that Dr. Richwerger's reports contain discrepancies and inconsistencies. For example, this psychologist noted plaintiff's numerous social limitations, yet found him to be only *moderately* limited in interfacing with the public. Plaintiff claims these problems conflict with the finding. It is true that the following social problems were noted by Dr. Richwerger: plaintiff sees his wife and son daily and gets along okay with them; he does not interact with friends and neighbors; he states that others do not want to be around him; he got angry near the end of the examination and walked out. Nevertheless, this psychologist additionally found that plaintiff had a *marked* limitation in ability to respond to work pressures, which is consistent with the aforementioned details. (Id. at 360.) There is no inconsistency here.

The term "moderate" is explained in the form as permitting the individual to function satisfactorily. The term "marked" means that although there is a serious limitation, ability to function is not precluded. The ALJ took these limitations into account, as reduced by his finding that plaintiff was only partially credible in regard to mental impairment, in finding plaintiff could do light unskilled work which involved simple job instructions and limited interpersonal contact. As such, plaintiff could do a modified range of light work. (Tr. at 26.) The ALJ also specifically pointed out that unskilled work usually involves working with objects rather than people and that plaintiff's interpersonal limitations would not preclude him from unskilled work. (Id. at 26.) See SSR 85-15.

The ALJ's reliance on Dr. Richwerger's and the State Agency's reports was based on substantial evidence.

B. The ALJ Did Not Fail to Adequately Evaluate Plaintiff's Credibility

Plaintiff contends that the ALJ erred in finding his complaints of pain to be only partially credible.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit

credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc).  The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them.  Id. at 345-46.  If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions.  See id. at 345-47.  The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[9]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing.  Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

---

[9] Daily activities which consume a substantial part of an applicants day are relevant.  "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be utterly incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

12

1    In this case the ALJ found that plaintiff was only partially credible, and pointed
out his activities which included laundry, vacuuming, visiting family, shoveling dirt and
fertilizing the garden, changing the oil in his truck, watching television, making his own
breakfast and sandwiches, taking walks, visiting, and shopping.  (Id. at 22, 23.)  These activities
are consistent with the light work assessment found by various doctors.  The ALJ summarized
the SSA assessment of April, 2003 which found that plaintiff could do light work, with limited
overhead reaching.[10]  (Tr. at 23, 282-84.)

   Dr. Johnson's assessment, based on medical records and exam, also indicated that
plaintiff could do a modified range of light work.  (Id. at 23, 230-31.)  This internist's diagnosis
was pain in the low back, mild arthritis in the hands, slightly impaired cerebellar exam of
unknown etiology, and pain in the right knee on straight leg raising which was not painful on
palpation.  (Id. at 230.)  Plaintiff had complained of pain in the hands, knees, shoulder, and back,
as well as breathing problems and depression.  (Id. at 226.)  Range of motion in the back was
80/90 degrees in flexion, 20/25 degrees in extension.  Lateral bending and rotation were normal.
Straight leg raising caused pain in the right knee and left thigh.  (Id. at 229.)  Range of motion in
the shoulders, elbows, wrists, hips, knees, and ankles was normal.  (Id. at 229-30.)  Based on this
exam, Dr. Johnson opined that plaintiff could lift and carry twenty pounds occasionally and ten
pounds frequently.  (Id. at 230.)  He could stand and walk two hours in a work day, with regular
breaks.  He could sit for six hours with breaks.  Bending and crouching were difficult.  (Id. at
231.)

   The ALJ next relied on Dr. Pliam's orthopedic exam to discount plaintiff's
complaints of pain.  On July 17, 2004, this physician, after reviewing plaintiff's medical records
and conducting an exam, found that plaintiff could lift twenty-five pounds occasionally and

---

[10] The ALJ refers to another SSA assessment of November, 2002, but that was a mental assessment only.  The court could not locate in the record a physical assessment done during this time period.

1  twenty pounds repetitively.  (Id. at 345.)  He could stand and walk for six hours.  He limited
2  plaintiff to sitting in a position which would allow him to alter his knee to allow flexion to
3  extension.  He thought plaintiff should only occasionally use his left upper arm overhead.  He
4  would be precluded from squatting or stooping.  (Id.)  To support this conclusion, Dr. Pliam
5  noted normal range of motion in the neck, back, elbows, wrists, fingers, hips, knees, and ankles.
6  (Id. at 342-43.)  There was mild impingement in the left shoulder.  There was a small effusion in
7  palpation of the knees and mild tenderness at the anterolateral joint line.  There was decreased
8  sensation at the lateral aspect of the right lower leg.  (Id. at 343.)  Diagnosis was mild left
9  shoulder impingement syndrome, right knee effusion, rule out meniscus tear, and probable right
10 S1 radiculopathy.  (Id. at 344.)   This physician noted, as emphasized by the ALJ, that plaintiff
11 had never had surgery, and was not receiving medical treatment at that time.  (Id.)  Dr. Pliam
12 recommended orthopedic treatment for plaintiff's knee and shoulder.  (Id. at 345.)

13          The ALJ further referenced Dr. Maples' evaluation which he stated eroded
14 plaintiff's complaints of pain.  This physician treated plaintiff for, among other things, his right
15 knee which evidenced arthritis by x-ray.  (Tr. at 210, 211.)  Dr. Maples ordered no further
16 treatment of his knee.  On May 22, 1999, Dr. Maples diagnosed acute cervical strain of the neck.
17 (Id. at 212.)  Plaintiff was prescribed anti-inflammatories and Vicodin and Valium on this one
18 visit only, and was to return for possible physical therapy if his symptoms continued.  The record
19 does not reflect that plaintiff returned for this problem.  (Id. at 212.)  The next record indicating a
20 neck problem was over four years later, in September, 2003 when plaintiff returned for neck pain
21 which had started two weeks earlier.  (Id. at 299.)  Dr. Maples thought it was related to his
22 Warthin's Tumor removal in 1999.  Plaintiff was referred to Dr. Spake for evaluation.  (Id.)  As
23 the ALJ pointed out, these treating records indicated no evidence of hospitalizations, diagnostic
24 studies for plaintiff's ruptured disc in his back, physical therapy, chiropractic care, surgery or
25 recommended surgery, treatment by specialists, or treatment in the way of pain injections or
26 referral to a pain clinic.  (Id. at 23.)  See Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995).

Finally, the ALJ pointed to the diagnostic evidence which did not support the degree of pain alleged. A CT scan of the neck in 1999 indicated severe degenerative change of the cervical spine with posterior spurring which appeared to result in at least moderate stenosis with foraminal narrowing. (Id. at 165.) The ALJ noted, however, that there was no disc herniation or protrusion, and little record of treatment for this finding, and no treatment by a specialist. (Id. at 23.)

The remainder of the record shows discrepancies in regard to plaintiff's complaints of pain, as noted by defendant. Plaintiff testified to lifting forty pound bags of fertilizer, yet also testified that lifting a carton of milk caused pain.[11] (Id. at 376, 393.)

### C. The ALJ Should Have Used the Testimony of a Vocational Expert

Plaintiff contends that the ALJ should have utilized a vocational expert based on his mental limitations (of limited interpersonal contact and simple job instructions) and exertional limitations such as being able to sit with his right knee extended.

The Guidelines in table form ("grids") are combinations of residual functional capacity, age, education, and work experience. At the fifth step of the sequential analysis, the grids determine if other work is available. See generally Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

The grids may be used if a claimant has both exertional and nonexertional limitations, so long as the nonexertional limitations do not significantly impact the exertional

---

[11] Although noted in regard to a mental evaluation, Dr. Richwerger stated that plaintiff gave a "suboptimal" effort on exam, and there were performance inconsistencies throughout the evaluation. (Id. at 220.) He also recounted plaintiff's conflicting statements regarding his marijuana use:

> The claimant states his last [drug] use was in 1988, but the claimant stated he smokes marijuana. The claimant stated he did not smoke that much, but then the claimant stated he smokes a few bowls of marijuana daily.

(Id.)

capabilities.[12]  Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds, Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc).  See Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2) (1996).  The ALJ must weigh the evidence with respect to work experience, education, and psychological and physical impairments to determine whether a nonexertional limitation significantly limits plaintiff's ability to work in a certain category.  Desrosiers 846 F.2d at 578 (Pregerson, J., concurring).  "A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines.  In such a case, the guidelines would be inapplicable."  Desrosiers, 846 F.2d at 577-78.  The ALJ is then required to use a vocational expert.  Aukland v. Massanari, 257 F.3d 1033 (9th Cir. 2001).

In this case, the ALJ found that plaintiff could do a modified range of light work with the following limitations: "occasionally perform postural activities but avoid crouching and stooping, occasionally reach overhead on the left, and mentally perform simple job instructions (unskilled work) with limited interpersonal contact."  (Id. at 26, 28.)  As a result, plaintiff could not perform his past work as a shipyard painter, but he could do unskilled work, and under Rule 202.11, he was not disabled, according to the ALJ.  (Id.)  In his formal findings, the ALJ found that plaintiff could do "substantially all of the full range of light work," and that plaintiff's capacity for light work was substantially intact and was not compromised by nonexertional limitations.  (Id. at 28-29.)

---

[12]  Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling.  20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary; Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).  Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities.  20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper, 880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)).  "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

1         Impairments which affect the mind, and limitations such as crouching, stooping and reaching are nonexertional in nature. SSR 83-10, *6. By specifically limiting their directives to one type of situation, the Social Security Rulings applicable here seem to indicate that if a claimant has only one nonexertional impairment, the occupational base is not eroded. By reverse implication, more than one nonexertional impairment may very well significantly impact the occupational base. For example, SSR 85-15 states that where balancing (and climbing) is the *only* limitation, it would not usually significantly impact the world of work; however, certain light jobs would be ruled out, such as construction painter. (Id. at *6.) (emphasis added.) This ruling also states that occasional stooping leaves the light work base intact. (Id. at *7.) See also SSR 83-10 (noting that majority of light work jobs can be done with occasional rather than frequent stooping). SSR 85-15 does not address the situation here, where plaintiff has limitations on stooping *and* crouching *and* reaching, in addition to his other limitations. The same ruling separately addresses reaching, which is required in almost all jobs. "Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations." (Id. at *7.)

        SSR 83-14 advises that although a particular nonexertional limitation may have very little effect on the range of work, an *additional* nonexertional limitation may so reduce the range of work that the claimant may be found disabled. (Id. at *3.) This ruling advises the use of a vocational expert in more complex situations. The ruling gives examples of limitations which do and do not require vocational testimony. Because light work usually requires occasional stooping (no more than one third of the work day), any limitation on this ability must be considered very carefully for a determination of its impact on the remaining occupational base of light work. (Id. at *4.) On the other hand, inability to ascend and descend scaffolding will not significantly affect the unskilled light work base. Where restrictions are between these two examples, the ALJ will usually require vocational expertise. (Id. at *5.) The limitation on

crouching and overhead reaching as found in this case, fall into the same category as stooping in that they may erode the occupational base. (Id. at *4-5.) Plaintiff has not just one but several nonexertional limitations.

Plaintiff claims he has an additional nonexertional limitation in that Dr. Pliam recommended that he be allowed to sit in a position which would permit him to alter the position of his knee to permit extension. (Tr. at 345.) The rulings do not address this particular limitation, but it should be addressed on remand.

Although plaintiff is limited to work involving simple job instructions with limited interpersonal contact, which taken alone may not erode the occupational base for light work, these nonexertional impairments may also affect the light work base when considered with the other limitations.

SSR 85-15 states:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

It is true that "not every malady of a 'nonexertional' nature rises to the level of a 'nonexertional impairment.'" Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir.1984). Use of the grids "cannot be defeated by low level personality and emotional disorders⋯." Id. Nevertheless, if the nonexertional impairment reduces the residual functional capacity, use of the grids is inappropriate. In this case, although the mental limitations set forth by the ALJ alone do not appear to reduce plaintiff's residual functional capacity, when taken in combination with plaintiff's crouching, stooping, overhead reaching, and leg extension limitations, they may affect the occupational base for light work.

It is additionally interesting to note that the ALJ found plaintiff could do a *modified* range of light work in the body of his decision, but then stated in his formal findings

18

that plaintiff could do *substantially all* of the full range of light work.  (Tr. at 26, 28.)  This use of terms appears to be internally inconsistent.  Nevertheless, it must be determined whether the occupational base has been eroded and to what extent.  See Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Because plaintiff's numerous restrictions may, taken together, have a significant impact on his ability to do the full range of light work, and because the record contains no information whether plaintiff's nonexertional impairments significantly limit the range of jobs available to him, reliance on the grids was improper.  The ALJ should have consulted a vocational expert to evaluate the impact of plaintiff's limitations on his ability to work.  The case will be remanded for this reason alone.  On remand, the vocational expert shall determine what work plaintiff can do with his limitations, and whether there are significant numbers of jobs in the national economy.

If the vocational expert determines that the range of light work is compromised to the extent that there are insufficient or no jobs that plaintiff can perform in the national economy, and is hence found initially disabled by the ALJ, *then* the ALJ should determine the extent to which plaintiff's drug use was a "contributing factor" to the found disability.  Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001).  The ALJ is not bound, as plaintiff seemingly argues, to accept self-serving statements by plaintiff as to his "decreased" drug use.  Whatever plaintiff's limitations in the mental area, he (and his wife) evidently soon realized that drug usage might well have an adverse effect on the application for disability benefits.  The ALJ should make this "contributing factor" determination over the entire claimed period of disability, if appropriate, or for specific periods of time after the claimed date of onset, if appropriate.[13]

\\\\\

---

[13] The court asked for supplemental briefing as plaintiff argued that he should be found disabled, or at least the case should be remanded, without consideration of alleged drug usage. Of course, if any of plaintiff's asserted mental/emotional limitations are true, the impairments may be "contributed to" by drug usage.

19

CONCLUSION

Accordingly, the court finds the ALJ's assessment is not fully supported by substantial evidence in the record or based on the proper legal standards. IT IS HEREBY RECOMMENDED that: Plaintiff's Motion for Summary Judgment or Remand be granted in part, the Commissioner's Cross Motion for Summary Judgment be denied, and the Clerk be directed to enter judgment for the plaintiff. This case should be remanded for further findings pursuant to sentence four of 42 U.S.C. § 405(g).

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within ten (10) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten (10) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 4/10/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Jones2323.ss.wpd